**Isis WHITE, a Minor Child by her Mother and Next Friend, Patricia WHITE, Plaintiff,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 85–706–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

April 7, 1986.

Kathleen Dring, Tidewater Legal Aid Soc., Norfolk, Va., for plaintiff.

Michael A. Rhine, Asst. U.S. Atty., U.S. Dept. of Justice, Norfolk, Va., for defendant.

## ORDER

DOUMAR, District Judge.

The plaintiff in this case seeks insurance benefits under the Social Security Act, 42 U.S.C. § 402(d). Her application was denied and her claim reviewed by an Administrative Law Judge (ALJ). Both parties have filed motions for summary judgment. For the reasons articulated below, this Court GRANTS the defendant's motion and DENIES the motion filed by the plaintiff.

### I.

Isis White (plaintiff) was born on November 26, 1975. On April 15, 1983, her mother, Patricia White (Ms. White), applied for survivor's insurance benefits with the Department of Health and Human Services on her daughter's behalf. The application alleged that Isis was the natural daughter of Francisco Alves who died on April 9, 1983 in Providence, Rhode Island. Her claim was denied by the Social Security Administration and she made a timely request for a hearing before an ALJ.

At this hearing, Ms. White testified that she and Mr. Alves had a continuous physical and emotional relationship from 1972 to 1977 while living in Providence. According to her testimony, she and Alves had sexual relations on a frequent basis during this period. Furthermore, she claimed that she

had no sexual partners other than Alves during the pertinent time span.

According to Ms. White, Alves stayed with her and Isis for days or weeks at a time, although he maintained his own residence. She also claimed that Alves freely accepted the fact that Isis was his child and admitted this fact to his friends. This testimony was supported by evidence given *ore tenus* by Cleophus Riddick, Ms. White's brother-in-law, and by notarized documents executed by Alves' mother and two of Ms. White's relatives. As further evidence of paternity, Ms. White submitted a hospital birth work-sheet on which Alves was identified as the father. This document was signed only by Ms. White. Similarly, the record contains an application for state assistance payments filled out by Ms. White in January of 1976 which shows Alves as Isis' father.

Ms. White testified that during the period preceding her breakup with Alves, he contributed approximately $40.00 a week for household needs, at least when he was working. In 1978, Ms. White and Isis moved to Virginia. Between 1979 and December of 1981, Alves sent six $100 money orders to Ms. White for their support. Although the record indicates that Alves was in contact with Ms. White and Isis after December of 1981, the plaintiff concedes that no support payments of any sort were made between December, 1981 and Alves' death in April of 1983.

After considering the documentary and testimonial evidence, the ALJ determined that Isis as not the child of Francisco Alves, either in the biological sense or as defined by the Social Security Act.

## II.

The Social Security Act provides two alternative sets of statutory criteria for determining the eligibility of illegitimate children for survivor's insurance benefits. Under either scheme, the child must be the biological or adopted son or daughter of the deceased. The ALJ determined that Isis was not the biological offspring of Alves; it is conceded that no adoption oc-

curred. Consequently, this Court's first task is to review the record for substantial evidence to support the ALJ's conclusion. *See Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If the record contains such support, no further inquiry is necessary.

In his decision dated September 20, 1984, the ALJ noted that Ms. White "is the mother of two other illegitimate children." Accordingly, he concluded that "even if [Alves] orally acknowledged that the claimant was his child, there is a distinct possibility that he was mistaken." Opinion of September 20, 1984 (hereinafter Opinion), at 5, R. at 14. The record, however, is completely devoid of any suggestion that Ms. White engaged in a sexual liason with anyone other than Alves during the pertinent period. The fact that Ms. White has perhaps displayed an indifference towards the institution of marriage in the past does not provide any basis for concluding that her long-term relationship with Alves was anything but monogomous. The ALJ cites no empirical evidence that suggests a correlation between a disdain for the institution of marriage and promiscuity. It is "illogical and unjust" to deny benefits to a child "in order to express society's disapproval of the parent's liasons." *Mathews v. Lucas*, 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651 (1976) (citations omitted).

Next, the ALJ claims that Ms. White's testimony as to her living arrangements with Alves was "inconsistent." "In October of 1983, [Ms. White] stated that they had not actually lived together and that they spent *some* weeks and weekends together. However, she testified at the hearing, that they stayed together three or four times a week and referred to this as living together." Opinion at 5–6, R. at 14–15 (emphasis in original). The ALJ also found it "strange" that the couple maintained separate residences, particularly in light of the financial difficulties they both were experiencing. Finally, he cited the "token" levels of support paid by Alves as an indi-

cation that Alves himself was not convinced he was Isis' father.

As to the alleged inconsistencies, they appear to be simply the result of loosely defined slang terms such as "living together." Ms. White consistently claimed that the two spent a substantial number of their evenings together, but not all of them. Whether this constitutes "living together" is a question this Court cannot, and need not, authoritatively determine. Even if the Court was to accept the ALJ's characterization of Ms. White's testimony, these inconsistencies do not provide any real evidence that Ms. White was wrong about the identity of Isis' father. The testimony and affidavits of those close to the plaintiff and the mother of the deceased support the claim. Further, several documents signed by Ms. White *ante litem motam* document her belief, from the time of Isis' birth, that Alves was Isis' father.

Substantial evidence is said to be that evidence which a reasonable mind would accept as sufficient to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). In this case, *all* of the testimonial and documentary evidence supports the plaintiff's claim that she is Alves' biological daughter. While the ALJ must be given substantial leeway is his credibility determinations, *see, e.g., Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951), this Court cannot find any basis in the record for the ALJ's determination that Alves did not father Isis.

### III.

█ Not all biological offspring of insured wage earners are entitled to benefits under 42 U.S.C. § 402(d). "The Act is intended to offset economic dislocation suffered by dependants on account of the death of the wage earner." *Jones v. Harris*, 629 F.2d 334, 336 (4th Cir.1980). Consequently, Congress has required, *inter alia*, that the applicant be "dependent upon

such [insured individual]" 42 U.S.C. § 402(d)(1)(C). This Court must, therefore, determine whether Isis was dependent on Alves within the meaning of the Act.

Congress recognized that requiring individualized determinations on the question of dependency in each case would be costly and inefficient. Under the statutory scheme, therefore, two classes of children are relieved of the burden of demonstrating actual dependency; legitimate children and children who would be entitled to take personal property from the deceased parent's estate under the intestate distribution laws of the state where the parent died.[1] 42 U.S.C. § 416(h); *Mathews v. Lucas*, 427 U.S. 495, 498–500, 96 s.Ct. 2755, 2759–60, 49 L.Ed.2d 651 (1976). Isis obviously does not fit into the first category. If she fits into the second, the Court need inquire no further, dependency is presumed. If, however, Isis does not qualify for "presumed dependence" under the Act, we must examine the extent and nature of Alves' support.

A. *Presumed dependency and 42 U.S.C. § 416(h)(2)(A).*

As noted above, no showing of actual dependency is required of one who is eligible to take under the intestacy laws of the state where the parent died. 42 U.S.C. § 402(d)(3). In the present case, Alves died in Providence, Rhode Island. Consequently, Rhode Island's law of intestate succession is incorporated by reference into § 402(d) by the provisions of § 416(h)(2)(A). The intestate statute provides in pertinent part:

A child born out of wedlock shall be capable of inheriting or transmitting inheritance on the part of his mother in like manner as if born in lawful wedlock. Any such child whose parents shall lawfully intermarry and shall acknowledge him as their child shall be deemed legitimate.

R.I. Gen.Laws § 33–1–8.

The plaintiff contends, and the Secretary does not genuinely dispute, that this stat-

---

**1.** If a child in either class has been adopted by a third party, a demonstration of actual dependency is required. 42 U.S.C. § 402(d)(3).

ute is facially unconstitutional. By its provisions, an illegitimate child is completely barred from inheriting property from his father; legitimate children face no such restriction. The statute is nearly identical to the one invalidated by the United States Supreme Court in *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). Further, the Rhode Island law has been declared unconstitutional by a United States District Court sitting in Rhode Island. *See Jett v. Schweiker*, C.A. No. 81-0425-P (D.R.I. September 15, 1982) (order affirming magistrate's findings and recommendations dated July 23, 1982). For these reasons, and because an authoritative determination is not necessary, given this Court's ultimate decision in the matter, this Court will proceed on the assumption that the law is invalid.

The next task for the Court is to determine the consequences of such a ruling on an illegitimate child seeking "presumed dependent" status under the Act.

"When a statute conferring benefits on a certain class of persons is held unconstitutional due to a violation of the equal protection clause, then the unlawful discrimination or classification must be eradicated, either by granting the benefits to the inappropriately excluded class, or by denying them to the class theretofore benefitted unlawfully." *Cox v. Schweiker*, 684 F.2d 310, 317 (5th Cir.1982) *citing Welsh v. United States*, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807-08, 26 L.Ed.2d 308 (1970). Under the majority rule, a constitutional infirmity in the Rhode Island statute would require this Court to extend eligibility for survivor's insurance benefits to those in Isis White's class, i.e., illegitimate offspring. *See Handley v. Schweiker*, 697 F.2d 999 (11th Cir.1983); *Cox v. Schweiker*, 684 F.2d 310 (5th Cir.1981); *Gross v. Harris*, 664 F.2d 667 (8th Cir.1981); *White v. Harris*, 504 F.Supp. 153 (C.D.Ill.1980); *Ramon v. Califano*, 493 F.Supp. 158 (W.D.

Tex.1980). Furthermore, *obiter dicta* from the *Mathews* case indicates that the United States Supreme Court may share this view. *Mathews*, 427 U.S. at 515 n. 18, 96 S.Ct. at 2767 n. 18.[2]

The Fourth Circuit Court of Appeals, however, has considered this question on several occasions and has consistently taken the opposite view, i.e., to correct the constitutional defect by *denying* benefits under § 416(h)(2)(A) to legitimate and illegitimate children alike. *See Jones v. Schweiker*, 668 F.2d 755 (4th Cir.1981), *vacated on other grounds sub nomine* 460 U.S. 1077, 103 S.Ct. 1763, 76 L.Ed.2d 339, on remand from Supreme Court, 712 F.2d 924 (4th Cir.1983), remanding with instructions 754 F.2d 519 (1985); *see also Parsons in re Bryant v. Secretary of Health and Human Services*, 762 F.2d 1188 (4th Cir. 1985). In the Fourth Circuit's view, this result is necessary to harmonize two competing interests: (1) the need to rectify the equal protection deficiencies, and (2) the need to validate the *state* legislature's intent. To provide benefits to illegitimate children through § 416(h)(2)(A) would be to "allow something where [the state] specifically provide[d for] the opposite." *Jones*, 754 F.2d 519, 520. Because this case was brought in the Fourth Circuit, § 416(h)(2)(A) is of no avail to the plaintiff; she will not be "presumed" to be dependent on the deceased.

### B. *Demonstrating dependence under 42 U.S.C. § 416(h)(3)(C).*

The plaintiff contends, in the alternative, that the record lacks substantial evidence to support the ALJ's determination that she was not dependent on Alves at the time of his death.

The uncontradicted evidence adduced at the hearing and submitted to the ALJ in documentary form establishes that Alves did, in fact, make some contribution to the

---

**2.** This footnote reads:

Appellees do not suggest, and we are unwilling to assume, that discrimination against children in appellees' class in state intestacy laws is constitutionally prohibited, see *Labine*

*v. Vincent*, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971), *in which case appellees would be made eligible for benefits under § 216(h)(2)(A).* (emphasis added).

support of Ms. White and Isis. While the three were living together, Alves made sporadic payments for household necessities. After Ms. White brought Isis to Virginia, the evidence shows that Alves sent approximately $600.00 to them in $100 increments. The last such payment was made in December of 1981. The ALJ termed these sums "token contributions", Opinion at 6, R. at 15, and found that Isis was not dependent on Alves.

"The proper test of 'support' in such a case is 'whether contributions are regular and substantial in relation to [1] the wage earner's income and [2] the ... child's needs' at the time of the wage earner's death." *Jones v. Schweiker,* 668 F.2d 755, 758 n. 5 (4th Cir.1981) *quoting Jones v. Harris,* 629 F.2d 334 (4th Cir.1980). This Court's inquiry into this facet of the case is complicated by the ALJ's failure to elicit testimony on the crucial issues of Alves' income and Isis' needs. The record does, however, indicate that Alves was an alcoholic with medical problems and a sporadic employment history. Further, Ms. White testified that she had learned from Alves' girlfriend in 1982 that medical impairments were preventing him from working. The plaintiff, citing *Jones v. Harris,* contends that under this analysis the payments were substantial in relation to Alves' ability to contribute.

The Fourth Circuit has noted that "[t]he purpose of the Act cannot be furthered by applying a test of substantiality of contribution in the abstract because the loss of *small, regular contributions* to a poor family would cause the economic dislocation the Act seeks to prevent." *Jones v. Harris,* 629 F.2d at 336 (emphasis added). The fact remains, however, that in this case, the last payment was made nearly a year and a half before Alves' death. In order to qualify, the applicant must be dependent at the time of the wage earner's death. However one characterizes the payments actually made, the plaintiff failed to show that dependence continued through April of 1983. As noted, the Social Security Act "is intended to offset economic dislocation suffered by dependants on account of the death of the wage earner." *Jones v. Harris,* 629 F.2d at 336. In this instance, it is apparent from the record that any economic dislocation suffered by the plaintiff was a result of Alves' voluntary cessation of payments and not his subsequent untimely demise.

## IV.

For these reasons, the plaintiff's motion for summary judgment is DENIED and the defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.